IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:05CR145 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| CAESAR HINOJOSA, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

    This matter is before the court on the motion to suppress filed by Caesar Hinojosa (Hinojosa) (Filing No. 46). Hinojosa is charged in three counts of a seven-count indictment (Filing No. 1). Count I alleges Hinojosa violated 21 U.S.C. 841(a)(1) and 841(b)(1) by knowingly and intentionally conspiring to distribute and possess with intent to distribute five hundred or more grams of methamphetamine between October 2004 and February 16, 2005; Count VI alleges Hinojosa used or carried a firearm on February 16, 2005 in furtherance of the drug trafficking crime alleged in Count I; and Count VII alleges a forfeiture claim under 21 U.S.C. §853.

    Hinojosa seeks to suppress all evidence derived from the alleged unlawful traffic stop and detention of Hinojosa by Omaha Police officers on February 16, 2005, and the search of the locked safe within Hinojosa's bedroom.[1] Hinojosa claims all such evidence was obtained in violation of his Fourth Amendment rights, and any consent to search his bedroom was involuntarily given and did not extend to the locked safe within his room. An evidentiary hearing was held on this motion on June 15, 2005. The transcript of the hearing was filed on June 23, 2005 (TR. - Filing No. 54).

---

[1] Hinojosa's motion to suppress states: "Officers interrogated Caesar Hinojosa whereupon he made incriminating statements." **See** Filing No. 46, ¶ 9. Hinojosa did not raise a Fifth Amendment claim in his motion, brief, or oral argument on the motion to suppress. No evidence concerning these alleged incriminating statements was offered at the evidentiary hearing. The court therefore concludes the motion seeks to suppress any incriminating statements Hinojosa may have made as fruit of the alleged Fourth Amendment violations.

1

The court heard the testimony of two Omaha police officers, Jeffrey Gassaway (Officer Gassaway) and Marlene Novotny (Officer Novotny). Officer Gassaway was a criminal investigator for the Air Force before he began his employment with the Omaha Police Department (OPD) eight years ago, and he is currently assigned to the gang suppression unit of OPD's criminal investigative bureau (TR. 5-7). Officer Novotny was a deputy sheriff for the Douglas County Sheriff's Department for eleven years before becoming a road patrol officer for OPD three years ago (TR. 28-29). Officer Novotny, along with her road patrol partner, Officer Sue Clark (Officer Clark), conducted a traffic stop of Hinojosa's vehicle on February 16, 2005 (TR. 30, 34-35). Officer Gassaway advised he was involved in the obtaining the alleged consent to search Hinojosa's bedroom and its contents. The following government exhibits were received into evidence at the evidentiary hearing: a copy of a ***Miranda*** Rights Advisory form (Exhibit 1), and a Permission to Search form (Exhibit 2), both presented by Officer Gassaway and signed by Hinojosa.

## FINDINGS OF FACT

On February 16, 2005, members of the Omaha police narcotics unit and the Omaha gang suppression unit, including Officer Gassaway, were concluding a joint narcotics investigation of suspected drug trafficking by Jesus Hinojosa, a co-defendant in this case and the brother of Hinojosa (TR. 7, 11). This ongoing investigation spanned a couple of weeks, during which time the officers saw individuals deliver methamphetamine to two separate confidential informants, with the primary individual involved being Jesus Hinojosa (TR.11-12). As part of the investigation, three Omaha residences, located on South 19th Street, South 37th Street, and South 22nd Street, and vehicles associated with those residences were under police surveillance (TR. 19). Jesus Hinojosa occupied the South 22nd Street residence, which was located on the northeast corner of 22nd and S Streets (TR. 7, 35). Hinojosa occupied a bedroom in the 37th Street residence, which was owned by his father Salvador Hinojosa (TR. 15 & Exhibit 2).

The planned final stage of the investigation, scheduled for the evening of February 16, 2005, included performing a controlled buy of narcotics, executing a warrant to search the

South 19th Street location while simultaneously contacting the occupants of the South 37th Street and South 22nd Street residences, and patrolling the local streets in the area of these homes for "vehicles of interest." Vehicles were "of interest" if they were previously seen coming and going from the suspect residences during the prior weeks of surveillance. Jesus Hinojosa's white Dodge Stratus, with Nebraska license plate number ONW 823, was a "vehicle of interest," but there is no evidence that officers ever saw this vehicle being used to carry out an illegal drug sale (TR. 9-10, 19-20).

Officer Quaites arranged the controlled buy to be conducted on the evening of February 16, 2005. This controlled buy was conducted in the area of 36th and Q Streets, and after it was completed, the seller left that location and drove to Jesus Hinojosa's South 22nd Street residence (TR. 7-8).

Immediately thereafter, at approximately 7:00 p.m., Officer Gassaway contacted Jesus Hinojosa at his South 22nd Street residence, conducted a search of that residence, and recovered approximately $58,000 in cash, handguns, pound packaging material for narcotics, and venue items (such as mail) indicating who lived at that residence (TR. 7-8). Officer Gassaway interviewed Jesus Hinojosa and asked about the source of the $58,000. Jesus Hinojosa stated he was involved in a narcotics enterprise that included several members, including Hinojosa, and the money seized during the search was proceeds from drug sales (TR. 17, 26).

While Officer Gassaway and other officers were inside the South 22nd Street residence, Officers Novotny and Clark were monitoring the streets near that location, and were specifically told to watch for a white Dodge Stratus. Both officers were in uniform. Their police cruiser was backed into an alley about a half a block west of the 22nd Street residence on the south side of S Street and in a location where the officers could see the South 22nd Street residence (TR. 29-31, 35, 48).

Officer Novotny was standing outside the police cruiser on S Street, at the entry to the alley directly across the street, when she heard a northbound vehicle on 22nd Street. Officer Novotny initially noticed the vehicle because is sounded like it was moving fast over the brick surface of 22nd Street. Officer Novotny turned to look at the vehicle. From a line of sight

perpendicular to 22nd Street and at a distance of a half block away, Officer Novotny identified the approaching vehicle as a white Dodge Stratus, and saw it speed up further and continue out of the area northbound. Officer Novotny was not certified to use radar to determine vehicle speeds and, in any event, she was not in her cruiser and was therefore unable to use such equipment as the Dodge Stratus proceeded northbound on 22nd Street. However, in her previous employment as a deputy sheriff, Officer Novotny was trained to visually estimate speed within a range of five miles per hour, and from her past experience, her visual estimations of speed, as confirmed by radar, were accurate to within five miles per hour. Based on her law enforcement training and experience, Officer Novotny estimated the Dodge Stratus was traveling 35 to 40 miles per hour. This speed estimate was never verified by radar because such equipment cannot be accurately used while following a vehicle. The posted speed limit in the area was 25 miles per hour (TR. 31-35, 43-44, 47-48, 49-51).

Officer Novotny returned to the police cruiser, and she and Officer Clark immediately pursued the Dodge Stratus to perform a traffic stop for speeding. The Dodge Stratus continued north to Q Street and turned west. Initially, the vehicle did not come to a full stop, but ultimately coasted to a stop just west of the intersection of 23rd and Q Streets. While following the vehicle, and as the vehicle coasted at a slow speed, Officer Novotny noticed a passenger sitting in the right front seat and observed the driver repeatedly bending and reaching over to the right passenger front seat area (TR. 34-37).

Once the Dodge Stratus stopped, Officer Novotny contacted the female passenger and Officer Clark contacted the male driver. Neither the driver nor the passenger could provide any proof of insurance or registration for the vehicle. The passenger produced identification, but the driver produced no identification or operator's license (TR. 37-38, 47). The driver was later identified as Hinojosa (TR. 11).

While the passenger was still seated in the Dodge Stratus, Officer Novotny noticed the passenger tucking her hands under her jacket, a windbreaker with a large front pocket. The passenger continued these movements as she and Hinojosa exited the Dodge Stratus. As the passenger walked to the rear of the vehicle, Officer Novotny saw an unusual bulge in the front crotch area of the passenger's pants. Officer Novotny pat-searched the passenger for

officer safety. Though the passenger initially stated the bulge was a feminine hygiene pad, Officer Novotny felt the object during the pat search, did not believe it was a feminine hygiene product, and based on her training and experience in drug interdiction, suspected it was drugs or money related to drug trafficking. The passenger then stated it was money. The passenger was handcuffed and placed in the officers' cruiser (TR. 38-40).

Hinojosa was also handcuffed and placed in the cruiser. At the request of officers investigating the South 22nd Street residence, Officers Novotny and Clark transported Hinojosa and the passenger three blocks to the South 22nd Street residence (TR. 10, 18, 21, 27, 40-41, 45-46).

Once at the 22nd Street location, a consent search of the passenger's crotch was performed, and both money and marijuana were found (TR. 41). The passenger was then transported to an OPD location at 24th and Vinton Streets, interviewed, and released (TR. 42),[2] but Hinojosa initially remained at the 22nd Street location. Hinojosa had identified himself but did not produce a driver's license or photo identification. Jesus Hinojosa also identified Hinojosa as his (Jesus Hinojosa's) brother and told the officers where Hinojosa lived (TR. 11).

Since Jesus Hinojosa had identified Hinojosa as his brother and the passenger in the Dodge Stratus was carrying a large amount of cash, Hinojosa was transported to the Omaha police central headquarters for further investigation (TR. 11-12). At approximately 10:30 p.m., Hinojosa was taken to a ten foot-by-ten foot interview room equipped with a desk and chairs. Both Officer Gassaway and Hinojosa were seated. Officer Gassaway was unarmed. Officer Gassaway identified himself and, at 10:42 p.m., advised Hinojosa of his *Miranda* rights. Officer Gassaway read the entire Omaha police form 17 "Rights Advisory Form" aloud. As each right was read, Hinojosa acknowledged he understood and Officer Gassaway wrote

---

[2] Hinojosa's motion states "Officers subsequently searched O'Riley [the passenger] and seized from her approx $1800 in cash and suspected marijuana," and "Officers subsequently interrogated O'Riley whereupon she made statements which the government will introduce as evidence against the defendant herein." **See** Filing No. 46, p. 2. No specific evidence was presented concerning any statements made by the passenger which may be used against Hinojosa. More importantly, Hinojosa can move to suppress evidence obtained in violation of his Fourth and Fifth Amendment rights; he cannot successfully move to suppress evidence allegedly obtained in violation of the passenger's rights.

"yes" on the form to indicate that response.  Hinojosa stated he understood each of his *Miranda* rights.  Then, reading directly from the form, Officer Gassaway asked, "Knowing your rights in this matter, are you willing to talk to me now?"  The defendant responded, "Yes," and signed the Rights Advisory Form (TR. 13-14, 25-26 & Exhibit 1).

The English version of the Rights Advisory Form was used and read because Hinojosa "spoke perfect English" and had previously communicated with Officer Gassaway in English without any difficulties (TR. 13).  Hinojosa did not appear to be under the influence of alcohol or any controlled substance, and did not ask any questions about his rights before signing the form (TR. 13-14).

Officer Gassaway then asked Hinojosa for consent to search Hinojosa's bedroom within Hinojosa's father's South 37th Street home.  Salvador Hinojosa, the father of Hinojosa and Jesus Hinojosa, had already consented to a search of the South 37th Street residence.  Officer Gassaway filled in the blanks of the Omaha police form 5 "Permission for Search" and went over the form with Hinojosa in English.  The language of the form stated that, by signing the form, Hinojosa "voluntarily authorize[d]" Officer Gassaway or any OPD officer to search the 37th Street residence.  The form further stated, "I FURTHER UNDERSTAND that I have a right to deny the officer(s) permission to search my property."  Hinojosa appeared to understand the contents of the form, asked no questions, expressed no limitations as to what areas within the 37th Street residence could be searched, and signed the form (TR. 15-16, 23 & Exhibit 2).

After the consent to search form was signed, Officer Gassaway asked Hinojosa if the officers performing the search would find anything in the bedroom.  Hinojosa stated there was marijuana and one or two handguns located in a black bag in the bedroom.  He did not, however, state or otherwise indicate that the officers' search of the bedroom was limited to locating the black bag (TR. 21-22).

When the officers at the South 37th Street location began to search Hinojosa's bedroom, they found a locked safe and contacted Officer Gassaway to ask Hinojosa for the safe's combination.  Hinojosa stated he did not know the combination, stated the safe was not his and belonged to a friend, and therefore he could not provide the combination or

consent to a search of the safe. Nonetheless, Officer Gassaway believed the safe was Hinojosa's, and since it was located in Hinojosa's bedroom, police opened and searched the safe pursuant to Hinojosa's statement of consent to search the bedroom (TR. 24-25).

## LEGAL ANALYSIS

Hinojosa claims his vehicle was illegally stopped, and his bedroom, and specifically the safe therein, was illegally searched in violation of his rights under the Fourth Amendment. Hinojosa claims all evidence arising from this allegedly illegal conduct must be suppressed.

The decision to make a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." **Whren v. United States**, 517 U.S. 806, 810 (1996). Any traffic violation, no matter how minor, provides a police officer with probable cause to stop the vehicle. **United States v. Fuse**, 391 F.3d 924, 927 (8th Cir. 2004); **United States v. Herrera-Martinez**, 354 F.3d 932, 934 (8th Cir. 2004); **United States v. Linkous**, 285 F.3d 716, 719 (8th Cir. 2002); **United States v. Alcantar**, 271 F.3d 731, 736 (8th Cir. 2001). "Courts are not to consider the motive for a stop as long as the reason for the stop is valid." **United States v. Jones**, 275 F.3d 673, 680 (8th Cir. 2001). Although a traffic stop cannot be pretextual, "so long as the officer is doing nothing more than [she] is legally permitted and objectively authorized to do, [her] actual state of mind is irrelevant for purposes of determining the lawfulness of the stop." **Alcantar**, 271 F.3d at 736, **see also Whren**, 517 U.S. at 812; **United States v. Bell**, 86 F.3d 820, 822 (8th Cir. 1996).

Police officers must be able to point to specific and articulable facts warranting the traffic stop. **Fuse**, 391 F.3d at 927. In this case, Officer Novotny testified that she stopped the Dodge Stratus driven by Hinojosa after visually estimating that the vehicle was exceeding the 25 mile per hour posted speed limit by at least ten miles per hour. Though insufficient to support a conviction for speeding under Nebraska law, a trained officer's visual determination that a vehicle is exceeding the speed limit is sufficient to provide probable cause to stop the vehicle for speeding. **See United States v. Little**, 178 F.3d 1297 (6th Cir. 1999) (unpublished) (where officer was trained to estimate speed within five miles per hour, his estimate that the defendant was speeding, though not confirmed by radar, justified stopping

the vehicle); ***United States v. Rivera***, 10 Fed. Appx. 617 (9th Cir. 2001) (unpublished) (where officer was capable of accurately estimating that defendant's vehicle was moving 75 miles per hour in 70 miles per hour zone, traffic stop for speeding was justified even though the officer lacked a radar gun, made the determination while his own vehicle was stopped, had just under one second to make such an estimate, and claimed he was certified but never explained the certification process).

Officer Novotny was previously trained to visually estimate speed within five miles per hour of the actual speed, and within the months prior to February 16, 2005 traffic stop, had successfully made accurate speed estimates when compared to her partner's determinations through radar. While visual estimates of speed do not provide strong evidence of a traffic violation, neither should they be discounted when offered through the credible testimony of trained and experienced officers. This is especially so where the officer is estimating speed in low speed zones; that is, for even a lay observer standing on the sidewalk, there is discernable difference between 25 and 35 miles per hour, even if, under the same circumstances, the difference between 70 and 80 miles per hour may not be noticed. In this case, not only did Officer Novotny immediately notice that the Dodge Stratus was traveling at a speed exceeding 25 miles per hour, she also saw it speed up as it approached and passed the 22nd Street residence. It is undisputed that Officers Novotny and Clark were tasked with keeping a lookout for the Dodge Stratus, and they were probably motivated to find an "articulable" reason to stop the vehicle if it entered the neighborhood. However, "[i]t does not matter if their true intent was to stop the car to see if it was carrying drugs." ***United States v. Stapleton***, 10 F.3d 582, 583-84 (8th Cir.1993). Further, it is immaterial that the officers may not have ordinarily stopped a car based on a visual estimate of speed alone.

Having considered Officer Novotny's credibility and her many years of law enforcement experience, the Court concludes she had a reasonable basis to stop Hinjosa's vehicle for speeding, irrespective of any underlying motivation she may have had for initiating the stop. Once Officers Clark and Novotny had a reasonable basis for believing the vehicle was exceeding the posted speed, there was probable cause to believe the driver committed a traffic violation and initiate a traffic stop. **See *Stapleton***, 10 F.3d at 584.

Hinojosa claims he was unlawfully detained and transported to the 22nd Street location following the traffic stop. Although law enforcement officers cannot continue to detain a motorist after the traffic stop is complete, if, during the course of the stop, the officers develop a reasonable articulable suspicion that criminal activity is afoot, the motorist may be detained further while the officers diligently investigate to quickly confirm or dispel their suspicions. *Fuse*, 391 F.3d at 927; *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647-48 (8th Cir. 1996).

In this case, Officers Novotny and Clark had the authority to detain Hinojosa for failing to have a driver's license, proof of insurance, or a vehicle registration. Moreover, under the totality of the circumstances, the officers had a reasonable basis for suspecting Hinojosa was involved in criminal activity. Prior to the stop, Officers Novotny and Clark knew the Dodge Stratus belonged to Jesus Hinojosa, who was suspected of illegal drug trafficking. During the course of the traffic stop, the officers observed the driver repeatedly bending and reaching toward the front seat passenger area as if trying to hide something; discovered the driver, later determined to be Hinojosa, had no driver's license on his person, and could not produce a vehicle registration or proof of insurance; and saw the passenger fiddling with her jacket as if she was trying to hide something and discovered, through a pat-down search and her statements, that she was hiding money in the crotch of her pants. The officers transported Hinojosa and the passenger to the home of Jesus Hinojosa, who owned the Dodge Status, located only three blocks away. From Jesus Hinojosa, law enforcement determined that both Jesus Hinojosa and Hinojosa were involved in illegal drug trafficking. Hinojosa was transported to OPD's central police station. Under these circumstances, there is no merit to a claim that Hinojosa was unlawfully detained following the traffic stop.

Even assuming, *arguendo,* the traffic stop and detention of Hinojosa exceeded the constitutional parameters set forth in **Terry v. Ohio**, 392 U.S. 1 (1968), an illegal stop and detention "is only the start, and not the end, of the Fourth Amendment analysis." **United States v. Thomas**, 83 F.3d 259, 260-61 (8th Cir. 1996) (**citing United States v. Ramos**, 42 F.3d 1160, 1164 (8th Cir. 1994)). The causal chain between an illegal traffic stop and

evidence discovered thereafter can be broken by sufficient acts of free will in consenting to a search by law enforcement. *Ramos*, 42 F.3d at 1164.

Determining whether a consent to search purges the taint of a prior Fourth Amendment violation requires a two-part inquiry. The court must decide: 1) if the defendant voluntarily consented to the search, and 2) whether this consent was given under circumstances that render it an independent, lawful cause of discovering the incriminating evidence. *United States v. Becker*, 333 F.3d 858, 861 (8th Cir. 2003). If the defendant's consent was both voluntary and an intervening lawful basis for conducting a warrantless search of Hinojosa's bedroom, the consent is sufficient to purge the taint of a prior illegal traffic stop.

Police may lawfully acquire access to search someone's home even without a warrant if that person voluntarily consents to the search. *United States v. Pennington*, 287 F.3d 739, 746 (8th Cir. 2002); *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000). The Eighth Circuit has clearly and recently summarized the analysis required in determining if a defendant voluntarily consented to a search.

> A court determines whether consent is voluntary under the totality of the circumstances. The Government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual. In evaluating the reasonableness of the officer's belief, we consider the characteristics of the person consenting, including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. We also consider the environment in which the alleged consent took place, specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently as the search occurred.

*United Stated v. Esquivias*, 2005 WL 1797319 (8th Cir. Aug. 1, 2005), **see also** *United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003).

Hinojosa is a literate adult whose primary language is Spanish.  However, he speaks "perfect English" and was able to communicate with Officer Gassaway in English.  Officer Gassaway neither observed nor heard anything to indicate Hinojosa was under the influence of drugs or alcohol.  Before Officer Gassaway asked for consent to search, Hinjosa was advised of each of his **Miranda** rights, including his right to remain silent and his right to a lawyer.  Hinjosa acknowledged he understood each **Miranda** right, asked no questions, and agreed to talk to Officer Gassaway.  Officer Gassaway then presented and went over the Exhibit 2 consent to search form.  Hinojosa acknowledged understanding the contents of that form and, by signature, verified that he understood he had the "right to deny the officer(s) permission to search" the property.  Although the **Miranda** advisory and consent to search forms were presented to Hinojosa in an OPD interview room, the room was ten-by-ten feet in size, Officer Gassaway was the only officer present, and he was unarmed.  The Court concludes Hinojosa was fully informed of his right to deny consent, and consented to a search of his bedroom.  Under the totality of these circumstances, a reasonable officer would have concluded Hinojosa's consent was freely and voluntarily given.

However, a "voluntary consent to a search, preceded by an illegal police action, does not automatically purge the taint of an illegal detention." **Becker**, 333 F.3d at 862.  Rather, to determine if the taint is purged, the court must consider: (1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.  **Becker**, 333 F.3d at 862.

Time elapsed between the illegal seizure and the consent and Hinojosa's constitutional rights were thoroughly explained to him during that time.  Hinojosa was not asked to consent to a search of his bedroom immediately after the traffic stop.  He was first transported to his brother's home, and then to the police station.  Officer Gassaway advised Hinojosa of Hinojosa's **Miranda** rights before presenting Hinojosa with the consent to search form, and Hinojosa confirmed in writing that he was willing to talk to Officer Gassaway.  Officer Gassaway then went over the consent form, and Hinojosa was thereby specifically advised of his right to refuse consent.  This fact

11

> [I]ndicates rather strongly [to the court] that [the officer] was not attempting to exploit an illegal situation. Further, [Officer Gassaway] had some suspicion that criminal activity was afoot, and [any] violation of *Terry* was not flagrant. Based on these [facts, the court concludes Hinojosa's act of] signing the consent form was sufficiently an act of free will to purge the taint of the preceding illegal detention.

See **Thomas**, 83 F.3d at 260-61, **see also United States v. Moreno**, 280 F.3d 898, 901 (8th Cir. 2002) (where there was considerable passage of time between the initial stop and the vehicle search, and trooper advised the defendant of his right to refuse consent, the consent was an act of free will and not the product of the trooper's attempt to exploit an illegal situation); **United States v. Beason**, 220 F.3d 964, 967 (8th Cir. 2000) (even assuming the officers lacked reasonable suspicion to stop the truck and that the subsequent detention was unreasonable, where a written consent form was signed after the officer instructed the defendant to read the form and ensured he understood it, and in the absence of any evidence of coercion, the defendant's consent to search the truck was "sufficiently an act of free will to purge the primary taint"); **United States v. Dickson**, 64 F.3d 409, 410-11 (8th Cir. 1995) (defendant's voluntary consent to search an apartment "was an independent act causally unconnected to the actions of the police" in entering the apartment without consent, and therefore the resulting search was lawful).

Hinojosa claims that even assuming the consent to search was valid, the consent was limited to retrieving a black bag containing guns and marijuana located in his bedroom, and opening the safe in that room exceeded the scope of the consent. "The standard for measuring the scope of consent under the Fourth Amendment is that of objective reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the individual?" **United States v. Fleck**, 413 F.3d 883, 892 (8th Cir. 2005).

Hinojosa consented to a search of his bedroom, and did not identify any areas or containers within the bedroom that could not be searched. This consent was broad and unlimited, was never withdrawn, and the officers never stated or indicated they intended to limit the scope of their search in any way. Under such circumstances, a reasonable officer

12

would have concluded Hinojosa consented to a search of his bedroom and all compartments therein, including the locked safe within the bedroom. **See *United States v. Coffman***, 148 F.3d 952 (8th Cir. 1998) (defendant's invitation to police officers to look around his home indicated voluntary consent to search, and searching under the defendant's bed and pillow did not exceed the scope of the consent), **see also, e.g. *United States v. Park-Swallow***, 52 Fed. Appx. 93 (10th Cir. 2002) (unpublished) (police officers' search of safe in defendant's bedroom did not exceed scope of defendant's oral and written general and unrestricted consent to full search of defendant's residence); **United States v. Bell**, 357 F. Supp. 2d 1065 (N.D. Ill. 2005) (defendant's written consent to search his motel room was broad enough to include search of locked room safe).

Hinojosa argues that, when asked for the combination to the safe, he stated he did not know the combination because he did not own the safe. Hinojosa claims this statement should have advised Officer Gassaway that the consent to search the bedroom was withdrawn or limited. Hinojosa's statement disavowing ownership of the safe or knowledge of its combination was not an "unequivocal act or statement of withdrawal" indicating an intent to revoke his consent. **See *United States v. Ross***, 263 F.3d 844, 846 (8th Cir. 2001). Moreover, assuming the truth of Hinojosa's claim, Hinojosa's consent did not permit a search of the safe because he had no interest in the safe, but if Hinojosa had no interest in the safe, he also has no standing to claim searching the safe violated his Fourth Amendment rights. **See *United States v. Liu***, 180 F.3d 957, 960 (8th Cir. 1999).

The Court therefore concludes the search of Hinojosa's bedroom, including the safe therein, was consensual. The Court further concludes Hinojosa's Fourth Amendment rights were not violated and his motion to suppress should be denied.

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Caesar Hinojosa's motion to suppress (Filing No. 46) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 8th day of August, 2005.

BY THE COURT:

s/Thomas D. Thalken<br>
United States Magistrate Judge